IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| VILASACK VONGKOTH,<br><br>            Plaintiff,<br>    v.<br><br>PCC STRUCTURALS INC.,<br><br>            Defendant. | Case No.: 3:22-cv-00681-AN<br><br><br>OPINION AND ORDER |

        Plaintiff Vilasack Vongkoth filed this action in Multnomah County Circuit Court on March 1, 2022 against defendants PCC Structurals Inc. ("PCC"), Cigna Insurance Company of North America ("CIGNA"), and Life Insurance Company of North America ("North America"), alleging denial of benefits under section 502(A) of the Employee Retirement Income Security Act ("ERISA"). PCC removed the action to federal court. Plaintiff subsequently dismissed CIGNA and North America, and PCC is the only remaining defendant in this action.

        PCC now moves for summary judgment. After reviewing the parties' pleadings, the Court finds that oral argument will not help resolve this matter. Local R. 7-1(d). For the reasons stated herein, the motion for summary judgment is DENIED.

## LEGAL STANDARD

**A.     Summary Judgment**

        Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine issue of material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). Material facts are those which might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Materiality is determined using substantive law. *Id.* A dispute is genuine "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Id.*

When a moving party demonstrates the absence of a genuine dispute as to any material fact, the nonmoving party that bears the burden at trial must show in response that there is evidence creating a genuine dispute as to any material fact. *Rivera*, 395 F.3d at 1146 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

**B.      ERISA Denial of Benefits**

29 U.S.C. § 1132(a)(1)(B) permits an employee benefits plan participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"

District courts review a decision to deny benefits under an ERISA-governed plan "'under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 981 (9th Cir. 2005) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). If a plan gives the administrator or fiduciary discretion to determine eligibility, the district courts review a decision to deny benefits for abuse of discretion. *Id.* Although no particular language indicates discretion, when "the words give a plan administrator the authority to interpret the plan's terms and to make final benefits determinations, discretion is unambiguously vested in the administrator." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963-64 (9th Cir. 2006).

Abuse of discretion review applies even if the plan administrator has a conflict of interest. *Id.* at 965. When a conflict of interest exists, the abuse of discretion review should be "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record" so that the district court may determine how much to credit the plan administrator's explanation for denying insurance coverage. *Id.* at 967-68. When an entity that administers a plan, whether employer or

insurance company, both decides whether an employee is eligible for benefits and pays those benefits, it occupies a "dual role" that creates a conflict of interest, and a court must weigh the conflict as a factor in determining whether there was an abuse of discretion. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). Similarly, procedural irregularities should be weighed when determining whether an administrator abused their discretion. *Abatie*, 458 F.3d at 972.

The test for abuse of discretion is whether the court is left with "'a definite and firm conviction that a mistake has been committed.'" *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009)). The court must "consider whether application of a correct legal standard was '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Id.* (quoting *Hinkson*, 585 F.3d at 1262). Under this standard, "the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" *Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (quoting *Firestone Tire & Rubber Co.*, 489 U.S. at 111).

When reviewing for abuse of discretion, a court may only consider evidence in the administrative record. *Abatie*, 458 F.3d at 970. Under *de novo* review, the court is not limited to the administrative record and may consider additional evidence necessary to conduct review. *Id.* In abuse of discretion review where a conflict of interest exists, a court may consider extrinsic evidence to "decide the nature, extent, and effect on the decision-making process of any conflict of interest" but must limit a decision on the merits to the administrative record. *Id.*

When the abuse of discretion standard applies in an ERISA benefits denial case, "'a motion for summary judgment is,' in most respects, 'merely the conduit to bring the legal question before the district court[,] and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 930 (9th Cir. 2012) (quoting *Nolan v. Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009)).

## BACKGROUND

Plaintiff was employed by PCC as a hand grind/production grinder. Def.'s Mot. for Summ. J., ("MSJ"), ECF [18], at 1. Plaintiff purchased a short-term disability plan, sponsored by PCC, that provided benefits to employees disabled by illness or injury. Compl., ECF [4], Ex. 1, ¶¶ 2-3; MSJ 1. North America and CIGNA are delegated the authority to administer the benefits plan, which is governed by ERISA § 502(A) (29 U.S.C. § 1132). Compl. ¶ 4.

On October 20, 2020, plaintiff became ill with a liver abscess. *Id.* ¶ 5. Plaintiff made a claim for, and was granted, short-term disability benefits under the plan from October 20, 2020 through December 4, 2020. MSJ 1, 3. Plaintiff made additional claims for the period beyond December 4, 2020, which were denied on the basis that he failed to show a continued disability. *Id.* at 1, 3-4. Plaintiff appealed the adverse benefits determination through the plan's administrative appeals process, and the denial was upheld on appeal. *Id.* at 1-2. The denial of the post-December 4, 2020 benefits is at issue in this lawsuit.

**A.     Terms of the Plan**

PCC entered into an Administrative Services Agreement (the "Agreement") between itself, as employer, and North America, as administrator. Decl. of Megan Bradford ("Bradford Decl."), ECF [19], Ex 1, at 6.[1] PCC sponsors and funds the short-term disability benefits plan and is considered the "Plan Administrator" under § 402(a) of ERISA and the terms of the plan. MSJ 2. Under the terms of the plan, PCC delegated responsibility for administering the plan, including review of claims and appeals, to CIGNA and North America. *Id.* The plan states that "[t]he administration of the Plan shall be under the supervision of the Plan Administrator [North America] . . . [who] will have full power to administer the Plan in all of its details." MSJ 3; MSJ, Ex. 1, at 33. In addition, the administrator has the role of "decid[ing] all questions concerning the Plan and the eligibility of any person to participate in the Plan." MSJ, Ex. 1, at 33. PCC retains other responsibilities, including enrolling eligible employees, maintaining employee records, and providing requested information to North America. *Id.* at 2.

---

[1] Although the copy of the Agreement filed with the Court was signed only by North America, and not PCC, no party disputes the validity of the agreement or that plaintiff purchased a benefits plan subject to the agreement.

The plan provides that a PCC employee is eligible for short-term disability benefits if, due to an injury or sickness, they are (1) "unable to perform all the material duties of his or her Regular Occupation" and (2) "unable to earn 80% or more of his or her Covered Earnings from working in his or her Regular Occupation." *Id.*, Ex. 1, at 17. Employees making a claim for short-term disability benefits must provide "satisfactory proof of disability" and, if requesting continuing benefits, "continued proof" of the disability. *Id.* at 23. Disability benefits end on the date that an employee is no longer considered disabled under the plan. *Id.* at 28.

Plaintiff's "Regular Occupation" is hand grind/production grinder. A hand grind/production grinder job requires "medium demand activities," defined as "work that requires '[e]xerting 20 to 50 pounds of force occasionally, or 10 to 25 pounds of force frequently, or greater than negligible up to 10 pounds of force constantly to move objects. Physical demand requirements are in excess of those for Light Work.'" MSJ 3 (citing Bradford Decl., Ex. 2, at 20, 371, 372).

**B.     Medical Information and Benefits Determinations**

Plaintiff made a claim for short-term disability benefits based on his liver abscess. Bradford Decl., Ex. 2, at 15. In support of his claim, plaintiff provided an authorization for CIGNA to access his medical information and a list of his providers. *Id.* at 23-25. The collected medical information, which is summarized below, was reviewed by North America when it determined that plaintiff should receive short-term disability benefits through December 4, 2020, but no later, and in denying plaintiff's appeal of that determination.

*1.     First Benefits Determination*

On October 23, 2020, plaintiff had a telehealth visit with his primary care physician, David Maslen ("Dr. Maslen"), for ongoing severe cough and fever. Bradford Decl., Ex. 2, at 211. Dr. Maslen wrote that plaintiff should be excused from work from October 21, 2020 through November 3, 2020 for medical reasons. *Id.* at 55. Plaintiff was admitted to Providence Milwaukie Hospital on November 2, 2020, where a CT angiogram showed a "heterogeneous 5.5 cm mass within left lobe of liver" that "appear[ed] to have a large soft tissue component as well as smaller fluid components." *Id.* at 217. A percutaneous hepatic

5

drain was placed to treat the abscess, and testing of the drainage liquid indicated an infection, so plaintiff was prescribed antibiotics. *Id.* at 296. On November 10, 2020, Dr. Scott Kemeny, a physician at the hospital, wrote that plaintiff had been hospitalized and would be able to return to work on November 24, 2020. *Id.* at 56.

Plaintiff had a follow-up appointment with Dr. Maslen on November 16, 2020. *Id.* at 123-24. Dr. Maslen concluded that plaintiff should not work through December 4, 2020. *Id.* at 57. On December 4, 2020, plaintiff met with Dr. Brian Kendall, a physician at Providence Portland Infectious Disease Consultants. *Id.* at 292. Dr. Kendall reviewed a CT scan taken on November 18, 2020, noting that it showed "no fluid or hypodensity." *Id.* Dr. Kendall wrote that plaintiff's "drain was removed," that plaintiff was still "sick," had been having loose, orange stools, had improved exercise tolerance up to walking over 15 minutes at a time, and had "coughing spells accompanied by rapid heart rate." *Id.* Dr. Kendall noted in his assessment that plaintiff was "slowly improving, still symptomatic but all are improving" and that "[g]iven the substantial decrease in size of the abscess on the CT scan almost 3 weeks ago, I suspect that his infection is resolved at this point." *Id.* at 292-93. Dr. Kendall also issued a letter stating that plaintiff should not work until January 15, 2021 due to "his continued convalescence from a serious infection." *Id.* at 58, 294.

On December 29, 2020, North America approved plaintiff for short-term disability benefits beginning October 27, 2020, seven days after his date of disability, through December 4, 2020. *Id.* at 44-45.

2.   *Second Benefits Determination*

On December 29, 2020, January 5, 2021, and January 8, 2021, CIGNA requested additional information from Dr. Maslen and Dr. Kendall to determine plaintiff's need for short term disability benefits beyond December 4, 2020. *See, e.g.*, *id.* at 59.

On January 8, 2021, Providence Infectious Disease Consultants faxed the requested information to CIGNA. *Id.* at 98. The fax included North America's medical request form, filled out by Dr. Kendall on January 6, 2021. *Id.* at 99. Dr. Kendall wrote that plaintiff had been diagnosed with a hepatic

6

abscess that impacted plaintiff's ability to work because of "fatigue and rehabilitation after severe infection." *Id.* Dr. Kendall stated that plaintiff was still taking ciprofloxacin, an antibiotic. *Id.* Dr. Kendall noted that he had placed restrictions on plaintiff, directing him to "rest through [his] next office visit," at which they would assess the resolution of his infection. *Id.* He indicated that plaintiff could not return to work, even with accommodations, but did not provide an explanation. *Id.* His preliminary estimate was that plaintiff would be able to return to work on January 15, 2021. *Id.*

On January 25, 2021, North America notified plaintiff that his disability benefits would not be paid beyond December 4, 2020. *Id.* at 105. The letter indicated that North America received a "Medical Request Form dated January 15, 2021"[2] that was "not sufficient for review." The letter stated that North American was "unable to determine if [plaintiff] remained disabled beyond December 11, 2020" because it had "not received the requested medical information regarding [plaintiff's] claim." *Id.* at 106.

On February 5, 2021, Dr. Maslen's practice, Northwest Primary Care, faxed CIGNA a copy of patient's health records and the medical request form. *Id.* at 111. In the medical request form, dated February 3, 2021, Dr. Maslen wrote that "dyspnea, palpitations, chest pain cause inability to work" and that plaintiff could not work until March 10, 2021. *Id.* at 112. Dr. Maslen indicated that plaintiff could not return to work, even with accommodations, but did not provide an explanation. *Id.*

Plaintiff's medical records include notes from an in-person appointment with Dr. Maslen on January 13, 2021, at which plaintiff complained of chest pain, cough, and rapid heart rate. *Id.* at 121. In his assessment, Dr. Maslen wrote:

> "[P]atient suffered an unusual syndrome of cough which ultimately was diagnosed as a liver abscess. He still has severe dyspnea and fatigue walking more than 10-15 minutes. There are concerning palpitations with a sense of racing heart. I wonder if there is cardiac pathology. I wonder if there remains liver pathology."

*Id.* at 122.

On January 18, 2021, plaintiff again met with Dr. Maslen to discuss his lab results. *Id.* at

---

[2] It is unclear what medical request form the letter is referencing. Dr. Kendall's medical request form was dated January 6, 2021.

7

119-20. Dr. Maslen wrote that plaintiff continued to experience "episodes of dyspnea, cough, chest pain and a sense of 'a racing heart'" that occurred between one to ten times per week and could last for ten minutes. *Id.* at 119. The visit notes mention that plaintiff saw a "gi" (gastroenterologist) and had a "normal cgd and colonoscopy" but that Dr. Maslen had not yet received the results. *Id.* Dr. Maslen concluded that plaintiff's labs were "looking better" and noted that plaintiff's pulse was "regular" with no "murmur, gallops, [or] rubs." *Id.* at 120. Dr. Maslen determined that the appropriate next step was to use a cardiac event monitor. *Id.*

On February 12, 2021, North America sent Dr. Maslen a request for additional information related to the specific activities that plaintiff could not perform, exam findings supporting Dr. Maslen's restrictions, why plaintiff could not work with accommodations, plaintiff's anticipated return-to-work date, and Dr. Maslen's recommended treatment plan. *Id.* at 135-36. On February 24, 2021, Northwest Primary Care faxed CIGNA the same information originally provided on February 5, 2021. *Id.* at 140. On February 25, 2021, North America sent a follow-up request to Dr. Maslen, noting that it had not received the information requested in the February 12th letter. *Id.* at 162.

On February 25, 2021, plaintiff had a follow-up appointment with Dr. Kendall. *Id.* at 268. Prior to the appointment, on February 22, 2021, plaintiff had a CT scan of his abdomen that indicated there was a "7 mm hypodensity" where his abscess had been, but that there was "no current injury minimal abscess" and that his abscess "ha[d] been adequately drained." *Id.* at 267. Dr. Kendall's office notes acknowledged that the CT scan confirmed that the abscess was cured, but that the cause of the abscess was unclear and required additional investigation. *Id.* at 269. Dr. Kendall noted that plaintiff was "slowly improving," though he still had "coughing spells that make his heart race," "[was] more tired with activity than baseline," and had "[r]are loose stools." *Id.* at 268. Dr. Kendall also noted that a follow-up heart monitor related to plaintiff's tachycardia was necessary "asap." *Id.* at 269.

On March 2, 2021, plaintiff again saw Dr. Maslen. *Id.* at 265. He reported that he was doing "a little bit better" and that he had been informed that his abscess was dry, but that he continued to suffer shortness of breath, a cough, and chest pain. *Id.* at 265. Dr. Maslen noted that in the preceding

8

weeks, plaintiff's cough had produced blood in the sputum. *Id.* Plaintiff stated that he was able to walk for up to an hour daily, and that "it is a good thing my wife forces me to exercise twice daily, at least I walk in the house twice a day." *Id.* Dr. Maslen issued another letter stating that plaintiff was excused from work until April 15, 2021. *Id.* at 185.

On March 4, 2021, CIGNA informed plaintiff that it would not continue paying benefits beyond December 4, 2020 because Dr. Maslen had not provided the clarification requested in its February 12, 2021 letter. *Id.* at 166-67. On March 15, 2021, Dr. Maslen provided additional information. He wrote that plaintiff was unable to perform "all activities," and that he based that finding on a "heart rate 100, diffuse abd pain, frequent cough, strongyloides antibody 0.2 (N <0.9)." *Id.* at 173. When asked if plaintiff could return to work with restrictions, Dr. Maslen wrote "No. Too sick. May return 04/16/21 depending on symptoms." *Id.* Dr. Maslen wrote that his recommended treatment plan was "await Holter monitor and GI data." *Id.* at 174.

    3.    *Administrative Appeal*

On March 22, 2021, plaintiff appealed the denial of his benefits beyond December 4, 2020. *Id.* at 178. In support of his appeal, plaintiff provided additional medical information, including the clarification that Dr. Maslen sent to CIGNA on March 15, 2021, and Dr. Maslen's note indicating that plaintiff was excused from work until April 15, 2021. *Id.* at 179-81.

Plaintiff was in a multi-vehicle accident on March 9, 2021. *Id.* at 262. On March 11, 2021, he saw Dr. Barry Rhodes ("Dr. Rhodes") for pain in his lower back, chest, neck, and the side of his head that was related to the accident. *Id.* Dr. Rhodes diagnosed him with a shoulder sprain, cervical sprain, and lumbar sprain/strain, and prescribed muscle relaxers and anti-inflammatories. *Id.* at 263. Plaintiff saw Dr. Rhodes again for continuing pain on April 22, 2021; Dr. Rhodes noted that plaintiff's MRI results showed disc bulges in his spine and suggested an aneurysm in the left vertebral artery. *Id.* at 254.

On March 31, 2021, North America issued a letter to plaintiff indicating that it had received the clarification letter from Dr. Maslen, a medical request form dated January 13, 2021, and plaintiff's medical records from October 23, 2020 through February 5, 2021. *Id.* at 219. The letter stated that the

9

additional information did not change the denial decision because "there was no indication of the severity of [plaintiff's] symptoms impacting [his] return to work as of December 5, 2020." *Id.* That same day, North America issued a letter to plaintiff acknowledging receipt of his appeal and noting that the "Disability Appeals Team is separate from the team who rendered the previous decision on [his] claim." *Id.* at 221.

On April 2, 2021, plaintiff received results from the cardiac event monitor. The results included "51 patient triggered transmissions. Fifty of these were for fluttering or skipped beats, and one had no associated symptoms. 5 of the episodes corresponded to sinus rhythm with premature ventricular complexes. The other 45 corresponded to sinus rhythm without arrhythmia." *Id.* at 238.

Plaintiff saw Dr. Maslen again on April 14, 2021. Dr. Maslen reviewed the cardiac monitor results and wrote that "liver abscess [patient] seems to have developed labile tachycardia and severe fatigue since the diagnosis of liver abscess. [E]vent monitor documents the labile heart rate at rest with light activity. [N]ot sure if abscess could have affected cardiac pacing and produced this result. [R]efer cardiology for opinion. [O]ff work in the meantime." *Id.* at 241. He also issued a note indicating that plaintiff should be excused from work through May 14, 2021. *Id.* at 242. The same day, Dr. Maslen faxed a medical request form to CIGNA that stated, "[patient] has developed severe, labile tachycardia and severe fatigue" that impacted his ability to return to work. *Id.* at 234. Dr. Maslen stated that plaintiff could not work, even with accommodations, because "event monitor shows labile tachycardia with pulse 119 at rest and 147.7 with light activity." *Id.* Dr. Maslen wrote that he would be better able to estimate a return-to-work date after a cardiology referral. *Id.*

On April 29, 2021, North America issued a letter to plaintiff updating him on the status of his appeal. *Id.* at 244. It indicated that it had reviewed new medical information submitted by Dr. Maslen, including information from plaintiff's office visit with Dr. Maslen on April 14, 2021. *Id.* Based on that review, it concluded that "the prior decision would be upheld" because "the medical information on file does not support [plaintiff's] functional impairment." *Id.* at 246. The letter clarified that plaintiff could respond by May 12, 2021 before a formal determination would be issued. *Id.* The letter indicated that any response "is considered information necessary to decide the claim." *Id.*

On May 3, 2021, North America notified plaintiff that it had had not received a response regarding its April 29, 2021 review. *Id.* at 368. The letter extended plaintiff's deadline to provide the requested information to June 1, 2021. *Id.* On May 11, 2021, Northwest Primary Care Group faxed CIGNA plaintiff's medical information, including the information from plaintiff's April visits with Dr. Rhodes. *Id.* at 248.

On May 13, 2021, plaintiff saw Dr. Yufei Zhang ("Dr. Zhang") for a follow-up appointment regarding his cardiologist referral. *Id.* at 295-96. Plaintiff told Dr. Zhang that two weeks earlier he fainted due to a racing heartbeat. *Id.* Dr. Zhang wrote that plaintiff was "physically unable to perform any job duties at this time.". *Id.* Plaintiff subsequently saw cardiologist Steven Riley ("Dr. Riley") on May 24, 2021. *Id.* at 321. Dr. Riley wrote that plaintiff reported palpitations, tachycardia, and syncope, and that his event monitor recorded "underlying sinus rhythm or mild sinus tachycardia, but no concerning arrhythmias." *Id.* at 326. He also reported that plaintiff's ECG and exam were normal, and that he had not felt palpitations since taking metoprolol prescribed by Dr. Zhang. *Id.* Dr. Riley stated that the next steps were obtaining an echocardiogram to check for underlying cardiomyopathy and rechecking a metabolic panel. *Id.*

On May 27, 2021, North America issued a letter to plaintiff updating him on the status of his appeal. *Id.* at 303. It indicated that his claim was being reviewed by a medical professional, and stated, "We will continue with our review of your claim and make our appeal determination as soon as possible." *Id.* It did not provide a determination deadline.

On June 4, 2021, North America issued a letter to plaintiff updating him on the status of his appeal. *Id.* at 306. It indicated that it had reviewed medical information submitted by Dr. Kendall, Dr. Maslen, Dr. Rhodes, and Dr. Zhang. *Id.* Based on that review, it concluded that "the prior decision would be upheld" because "the medical information on file does not support [plaintiff's] functional impairment." *Id.* The letter clarified that plaintiff could respond by June 17, 2021 before a formal determination would be issued. *Id.*

On June 14, 2021, plaintiff was seen by Dr. Maslen, who wrote a note that plaintiff should

11

be excused from work for medical reasons until July 14, 2021. *Id.* at 317. In his assessment, Dr. Maslen wrote that plaintiff's "severe fatigue and tachycardia/weakness syndrome" was still being investigated by cardiology. *Id.* at 319. While the infectious disease department declared that the abscess was cured on February 21, 2021, the tachycardia continued, and the cause was unclear. Dr. Maslen wrote, "given dramatic waxing and waning unprovoked tachycardia we do not think it is yet safe for [patient] to return to work. [W]e feel a crisis could occur such as loss of consciousness with associated disaster. [W]e recommend waiting until at the soonest [patient] has been given clearance by cardiology." *Id.*

On June 15, 2021, North America issued a letter to plaintiff updating him on the status of his appeal. *Id.* at 313. It noted that it had not received a response to its June 4, 2021 letter, and that it had been contacted by plaintiff's attorney, who had requested an extension of the response deadline to July 14, 2021. *Id.* The letter stated that it had granted the extension request and stated that it would "not make a final determination of [plaintiff's] appeal until [he] either provide[d] [North America] the necessary information, or until [he] advise[d] [North America] that [he] would like [it] to make a decision without that information." *Id.* The letter stated that North America would "make [the] appeal determination as soon as possible" but did not otherwise indicate a determination date. *Id.*

On June 16, 2021, Dr. Kendall provided information at CIGNA's request. He wrote that plaintiff had been diagnosed with a liver abscess and could not work through January 30, 2021. *Id.* at 329.

On July 6, 2021, plaintiff's attorney wrote to CIGNA, stating that the June 4, 2021 letter disregarded pertinent details from plaintiff's medical information, such as "abnormal laboratory results through at least February 2021," and "chest pain, difficulty breathing and rapid heart rate [ ] through April 2021." *Id.* at 334. On July 15, 2021, CIGNA issued a letter to plaintiff's attorney, acknowledging that plaintiff would be submitting additional information and extending the deadline to submit that evidence to August 13, 2021 at plaintiff's attorney's request. *Id.* at 341. The letter stated that CIGNA would "make [the] appeal determination as soon as possible" but did not otherwise provide a determination deadline. *Id.*

On July 28, 2021, plaintiff's attorney faxed additional evidence to CIGNA. *Id.* at 342. The evidence included a letter written by Dr. Maslen, which stated it was "reasonable to conclude that [plaintiff]

12

had suffered from a liver abscess for over a year that was never diagnosed" because plaintiff initially began experiencing cough symptoms in November 2019, continued to experience symptoms, and was ultimately hospitalized in November 2020, at which point he was diagnosed with a liver abscess positive for Klebsiella pneumonia. *Id.* at 344. Cardiac symptoms ensued, which continued at visits as recently as June 14, 2021. *Id.* Based on his assessment, Dr. Maslen wrote:

> "We feel that this patient has suffered from severe autonomic dysfunction associated with a longstanding liver abscess which was not treated for potentially a year or longer. We feel this has rendered the patient's autonomic nervous system, his auto regulatory cardiac rate, and autonomic cough stimulation reflex dysfunctional. We feel that this has resulted in severe dyspnea, lightheadedness, weakness, and fatigue. The patient does seem to be making slow progress and does feel that he can return to work in a limited capacity in August 2021."

*Id.* Ultimately, Dr. Maslen wrote, "[W]e do feel that this patient was incapable of performing physical work stretching from October 2020 through August 2021." *Id.* at 345.

On August 11, 2021, North America issued a letter, stating that plaintiff's claim was being reviewed by a medical professional. *Id.* at 346. The letter indicated that an appeal determination would be made "as soon as possible," but did not otherwise provide a determination deadline. *Id.*

On August 30, 2021, Dr. Stephen St. Clair ("Dr. St. Clair"), a doctor specializing in occupational medicine, conducted an independent review of plaintiff's medical records at CIGNA's request to determine if the medical documents supported "the presence of continuous physical functional limitations and listed activity restrictions on file." *Id.* at 349. After reviewing plaintiff's file, Dr. St. Clair determined that there were no co-limiting conditions from December 5, 2020. *Id.* at 352. Dr. St. Clair disagreed with certain findings of plaintiff's doctors because "the treating providers' opinions are not well supported by medically acceptable clinical or laboratory diagnostic techniques and are inconsistent with the other substantial evidence in the claim file." *Id.* Specifically, Dr. St. Clair noted that (1) there was no evidence of ongoing liver abscess after December 4, 2020, and plaintiff's CT scan on February 22, 2021 showed that the liver abscess was adequately drained, meaning that there was no ongoing liver issue to support Dr. Kendall's recommendation that plaintiff remain off work through January 30, 2021; (2) there was no finding to support work restrictions related to plaintiff's tachycardia and fainting, based on the cardiac event monitor

results and Dr. Riley's May 24, 2021 exam showing normal vitals; and (3) plaintiff's pain complaints in his appointments with Dr. Rhodes following his car accident did not support any work limitations. *Id.* Dr. St. Clair concluded that plaintiff had no functional limitations from December 5, 2020 forward and did not require restrictions any activities, including work. *Id.* at 353.

On September 1, 2021, CIGNA issued a letter updating plaintiff on the status of his appeal. *Id.* at 358. The letter indicated that it had reviewed additional evidence submitted by Dr. Riley, Dr. Kendall, and Dr. Maslen. *Id.* Based on that review, CIGNA found that "the medical information on file does not support [plaintiff's] functional impairment" and the "prior decision would be upheld." *Id.* at 360. The letter stated that plaintiff could respond to the explanation with additional evidence by September 14, 2021. *Id.*

On September 9, 2021, CIGNA issued a letter acknowledging, and granting, plaintiff's attorney's request to have the deadline to submit additional evidence extended to September 27, 2021. *Id.* at 361. On September 20, 2021, plaintiff's attorney faxed CIGNA a written letter in which he stated that the September 1, 2021 status letter did not address "findings related to [plaintiff's] primary diagnosis and subsequent sequelas." *Id.* at 363. Specially, the letter noted that CIGNA had not addressed Dr. Kendall's records from December 4, 2020, which indicated that plaintiff was still experiencing symptoms, laboratory records from February 2021 indicating abnormal findings related to LgG antibodies suggesting a current or past infection, cardiac monitoring showing labile tachycardia, and plaintiff's resting heart rate between 90 and 120 bpm at his June 14, 2021 visit. *Id.*

On September 23, 2021, CIGNA issued a letter stating that the letter contained information that was "already considered in [its] review and the reports that were provided." *Id.* at 365. CIGNA issued a final decision affirming its denial on September 28, 2021. *Id.* at 376.

## DISCUSSION

### A. Standard of Review

The parties dispute whether the Court should review the appeal *de novo* or for abuse of discretion.

The plan gives the administrator discretion to determine eligibility and construe the terms

14

of the plan. The Agreement states that the administrator "will have full power to administer the Plan in all of its details," including interpreting the plan and determining eligibility. Bradford Decl., Ex. 1, at 33. This language unambiguously vests discretion in the administrator. As a result, the Court reviews for abuse of discretion.

Plaintiff argues that, although the plan gives the administrator discretion to determine eligibility for benefits, a *de novo* standard of review should apply because a conflict of interest exists. Pl.'s Resp. 6. He alleges that the record demonstrates a conflict of interest "in terms of disregarding medical evidence and diluting the objectivity of their review of the plaintiff's benefits" and that defendant sent a "blatantly biased" referral to Dr. St. Clair in an attempt to influence him. *Id.* at 6-7, 10. Plaintiff also alleges, but does not describe or identify, a structural conflict of interest. *Id.* at 12.

*De novo* review is inappropriate even if a conflict of interest exists. *See Abatie*, 458 F.3d at 965. If a conflict of interest exists, the Court must take that into consideration in its review for abuse of discretion. *Id.* at 967-68. As a result, the standard of review remains abuse of discretion.

No structural conflict of interest exists in this case. PCC sponsors and funds the plan, while CIGNA and North America administer it, meaning that no single entity occupies a dual role creating a structural conflict of interest. Plaintiff does not identify which, if any, medical evidence he believes defendant disregarded, and while the insurance administrators disagreed with plaintiff's treating physicians, their correspondence reflects that they reviewed plaintiff's medical evidence in rendering their decision. Thus, no conflict of interest or procedural irregularity occurred related to failure to review medical evidence.

Finally, the Court finds that, based on the record before it, the referral letter to Dr. St. Clair was not intended to cause bias and did not create a conflict of interest. The referral reads:

> "47 YO M, 0cc - Hand Grind, Functional Level - Med ID 10/20/2020 LOW - 10/16/2020, BSD - 10/27/2020 BPtd - 12/4/2020 Btd - 4/19/2021 Diagnosis• OOW w/ Liver Abscess Resources utilized by Core Team - NCM Per claim team decision letter, medical info does not support functional loss. Per review, Cx had complaints of dyspnea, chest pain and palpations. However no restrictions were placed Please review available medical info and comment if Std is supported from 12/4/2020 forward. If so thru what date?"

15

Bradford Decl., Ex. 2, at 243.  Plaintiff does not identify what portion of this referral he believes is intended to cause bias or why.  The statement that "Per claim team decision letter, medical info does not support functional loss" reflects the claim team's conclusion in the prior benefits determination and does not recommend a conclusion for Dr. St. Clair.  The statement that "no restrictions were placed" is inaccurate, as plaintiff's treating physicians provided written statements that plaintiff was not able to do any work until dates beyond December 4, 2020, but Dr. St. Clair's report indicates that he was aware of and reviewed those opinions in preparing his own.

Because no conflict of interest exists, the Court reviews the benefits claim for abuse of discretion without taking any conflicts into consideration.

**B.      Benefits Claim**

Generally, a review of a denial of benefits for abuse of discretion on a motion for summary judgment, for which the court reviews only the administrative record, asks the court to address the legal question.  *See Stephan*, 697 F.3d at 930; *Nolan v. Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009).  Here, however, only defendant has moved for summary judgment.  Plaintiff has not filed a cross-motion seeking a declaration that, as a matter of law, the denial was an abuse of discretion.  Accordingly, the Court applies traditional summary judgment standards and considers, viewing the evidence in the light most favorable to plaintiff, whether there is any genuine dispute of material fact as to whether the determination to deny plaintiff's disability claim beyond December 4, 2020 was not an abuse of discretion.

Defendant argues that the denial of plaintiff's short term disability claim beyond December 4, 2020 was reasonable and, therefore, the administrator did not abuse its discretion, because plaintiff failed to prove an ongoing disability that prevented him from performing his job after that date.  MSJ 14.  Central to this argument is defendant's assertion that many of plaintiff's symptoms were self-reported, and the resulting assessment from plaintiff's treating physicians that he could not return to work were based on subjective, self-reported symptoms rather than objective medical evidence.  *Id.* at 15.  Defendant argues that, in fact, plaintiff's self-reported symptoms such as "frequent cough, shortness of breath, fatigue, and a rapid heart rate" were "often belied by testing."  *Id.* at 16.  Defendant also argues that when plaintiff's

16

treating physicians, particularly Dr. Maslen, found that plaintiff could not work, they did not consider plaintiff's specific job duties as a hand grind and his functional ability to perform those duties. *Id.*

Dr. St. Clair's report shows that he reviewed all relevant medical information submitted by plaintiff. The Court finds however, that there are disputed issues of material fact regarding whether Dr. St. Clair's and, ultimately, the administrators' conclusion was implausible, illogical, and unreasonable, raising a genuine issue of material fact as to whether the administrators abused their discretion in denying plaintiff benefits beyond December 4, 2020.

Each treating physician that opined on plaintiff's ability to work stated unequivocally that he was not able to work until significantly beyond December 4, 2020: Dr. Kendall, the infectious disease specialist who treated plaintiff through February 2021, stated that plaintiff was unable to work through January 30, 2021; Dr. Zhang, who examined plaintiff on May 13, 2021, found that he was unable to work at that time and pending a cardiology follow-up; and Dr. Maslen, a primary care physician who treated plaintiff throughout the entire period covered in the record, found that plaintiff was unable to work through August 2021. Dr. Riley did not provide an assessment of plaintiff's ability to work, but did state that he required additional cardiac testing for possible cardiomyopathy. The only doctor who found that plaintiff had no functional limitations was Dr. St. Clair.

Courts are not required to give treating physicians special deference in ERISA cases. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The fact, however, that every other doctor who was asked to make a disability determination found that plaintiff was unable to work after December 4, 2020 raises the issue of whether Dr. St. Clair's conclusion is illogical and implausible. *See Salomaa*, 642 F.3d at 676 (finding that plan administrator abused discretion where, amongst other factors, "[t]he only documents with an 'M.D.' on the signature line concluding that [plaintiff] was not disabled were by the physicians the insurance company paid to review his file").

Dr. St. Clair is also the only physician who did not personally examine or treat plaintiff, and he did not request to speak with plaintiff's treating doctors or hold an independent medical examination of plaintiff. Although ERISA does not require an in-person medical evaluation, the decision to conduct a

paper review rather than an in-person medical evaluation "raise[s] questions about the thoroughness and accuracy of the benefits determination[.]" *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 634 (9th Cir. 2009) (alterations in original) (quoting *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008)). Choosing not to conduct an in-person medical evaluation is "particularly dubious when the claimant's condition is based on subjective symptoms." *Veronica L. v. Metro. Life Ins. Co.*, 647 F. Supp. 3d 1028, 1040 (D. Or. 2022) (citing *Robertson v. Standard Ins. Co.*, 139 F. Supp. 3d 1190, 1205 (D. Or. 2015), *order clarified*, 2015 WL 13682034 (D. Or. Nov. 13, 2015)).

The assertion that plaintiff's treating physicians' opinions were based on self-reported symptoms and often belied by objective medical testing, rendering them inconsistent with other substantial evidence, is also disputed by the record. Plaintiff suffered from symptoms, including spells of racing heart and fainting, that, due to their transient nature, would be difficult to record by any means other than self-reporting. The fact that plaintiff recorded an unremarkable pulse or blood pressure at some appointments is not inconsistent with experiencing a racing heart, fainting, or other symptoms. Plaintiff did in fact wear a cardiac event monitor over a period of thirty days in an attempt to capture cardiac symptoms, which recorded an underlying sinus rhythm or sinus tachycardia, "labile tachycardia with pulse 119 at rest and 147.7 with light activity," and resulted in a referral for an echocardiogram. Bradford Decl., Ex. 2, at 234, 326. Plaintiff also suffered from symptoms, such as severe fatigue, that are inherently subjective. No diagnostic testing exists for subjectively reported symptoms, and plaintiff's treating physicians are in a better position to assess the credibility and severity of self-reported symptoms. *See Hamid v. Metro. Life Ins. Co.*, 517 F. Supp. 3d 903, 917 (N.D. Cal. 2021) ("In ERISA cases, the opinions of treating physicians are not entitled to special deference, but as compared to physicians who conduct only paper reviews, treating physicians are far better positioned to assess a claimant's credibility.").

Finally, defendant's decision appears to be based in part on the fact that plaintiff's treating physicians did not identify specific functional impairments affecting plaintiff's ability to meet the physical demands of his work as a hand grind. MSJ 16. While it is true that plaintiff's treating physicians did not address plaintiff's ability to engage in specific "medium demand" activities, such as exerting twenty to fifty

18

pounds of force occasionally, they unanimously agreed that he was not able to do *any* work due to his symptoms after December 4, 2020. Their opinions clearly encompass all work activities, including those performed by a hand grind. Plaintiff's medical records reflect limited physical capacity: plaintiff could not walk for more than ten to fifteen minutes without severe fatigue as of his February 5, 2021 medical appointment, and by March 2, 2021, he was able to walk for up to an hour a day. His primary treating physician feared that plaintiff might faint on the job, causing a "disaster." These measures of plaintiff's capacity for physical exertion do not suggest that he was capable of "medium demand" physical activities.

There are serious questions about whether the administrator's determination that plaintiff was not eligible for benefits beyond December 4, 2020 was illogical, implausible, and unreasonable when considering the entire record. As a result, there is a genuine issue of material fact as to whether the administrator abused its discretion in denying plaintiff's claim for benefits. Accordingly, summary judgment in favor of defendant is not appropriate.

## CONCLUSION

For the foregoing reasons, defendant PCC Structurals Inc.'s Motion for Summary Judgment, ECF [18], is DENIED.

IT IS SO ORDERED.

DATED this 26th day of March, 2024.

_____
Adrienne Nelson
United States District Judge